675 A.2d 641

IN THE MATTER OF RICHARD W. BANAS,
AN ATTORNEY AT LAW.

Argued November 28, 1995—Decided May 10, 1996.

*John McGill, III*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Lawrence S. Lustberg* argued the cause for respondent (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg* and *Mark A. Berman,* on the brief).

PER CURIAM.

After a public hearing, the District VC Ethics Committee (DEC) recommended public discipline of respondent, Richard Banas, for violations of *Rules of Professional Conduct* (RPC) 1.15 (safekeeping property); 4.1 (truthful statements to others); and 4.4 (respecting legal rights of third persons).

The Disciplinary Review Board (DRB) concluded that respondent had violated *RPC* 1.15(b), which states that "a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive." For that violation, the DRB recommended a six-month suspension. Two members of the DRB voted to dismiss the complaint. We agree with the DRB that respondent violated *RPC* 1.15(b), but we believe that we will serve the interests of the disciplinary system through a public reprimand.

From the record, the following facts emerge. Carl Grant (subsequently identified as "Carl") retained respondent in August 1992 to represent him in the retrial of a homicide case in which Carl's previous conviction had been reversed on appeal. Carl and respondent agreed on a fee of $25,000, but neither Carl nor anyone else ever paid the full fee. Instead, a co-defendant, Tyrone Rush, paid respondent $10,000.

While respondent was preparing for the retrial, Carl, who remained incarcerated, spoke to respondent about getting out of jail. Respondent was interested in the payment of the balance of the agreed fee. He did not want to undertake the additional work required to obtain Carl's release until he received another payment. Carl, however, had no money for either respondent's fee or bail.

According to grievant, Carl's mother (subsequently identified as "Mrs. Grant"), a friend of Carl's, identified as "Paul," was willing

to pledge as collateral a house that the friend and his girlfriend owned, provided that he receive a $10,000 fee. Mrs. Grant apparently wanted both to seek Carl's release from jail and to assure that respondent would continue to represent Carl. Although unwilling to pledge her house as collateral, she was willing to borrow from two banks the $5,000 that she ultimately paid to respondent. At that time, respondent gave her a receipt stating that he had received the funds "on behalf of Carl Grant to be held for bail application. Money is to be returned to M. Grant if bail not obtained." The receipt also bore the notation that the balance due was "zero."

The parties' conflicting goals may have affected their recollection of the subsequent events. According to Mrs. Grant, she indicated to respondent that she wanted a full refund if her son's bail was not arranged. Carl's sister, who accompanied her mother to respondent's office in September 1992, testified that her mother specifically had asked whether the $5,000 would be returned if Carl did not get out on bail. She testified further that respondent replied "most certainly." Respondent's understanding was that the $5,000 was for his continued representation of Carl, not merely for the bail proceedings. Respondent thought that "obtain" meant "set," and that the fee would become earned once bail was set.

Ultimately, bail was set at $100,000. Carl, however, was unable to post bail because Paul's girlfriend would not agree to pledge their house as security. Respondent, who had placed the $5,000 in his business account, applied the money to fees that Carl owed him.

A further problem developed. Apparently, the $10,000 fee that the co-defendant Rush had paid to respondent represented proceeds from the sale of stolen bearer bonds. As respondent explained:

[Another attorney] and I met with Judge Codey to discuss the situation. He advised us to make a motion to be relieved as Counsel due to the fact that we both were, in effect, potential witnesses against Mr. Rush and therefore neither of us could participate in a trial involving him. We both made the motion and Judge Codey relieved us. I subsequently met with [Carl] and discussed his case with him

and indicated I would help his new counsel and himself with his case in any way that I could. And I did have meetings with both new counsel assigned to the defendants.

Although respondent was relieved as Carl's counsel, in June 1993 he participated in negotiating a plea bargain for him.

### The DRB describes the intervening events:

On December 2, 1992, after unsuccessful attempts to reach respondent by telephone, Mrs. Grant wrote to him requesting the refund of "my $5,000 which was to be used toward bail for my son Carl Grant." Mrs. Grant never received a return call or letter from respondent. She, therefore, filed a grievance against him on January 14, 1993. She stated that she did not speak with respondent between the delivery of the funds, on September 30, 1992, and the DEC hearing, on July 16, 1994.

Furthermore, Mrs. Grant claimed that she did not know about her son's affidavit, discussed below, until just before the DEC hearing. She did not know what promises her son had made to respondent about the purpose of the $5,000.

Respondent claimed that he did not know that Mrs. Grant and her two daughters had called his office. He denied knowledge that Mrs. Grant wanted the money returned until he received her December 1992 letter. He acknowledged that he did not reply to her letter. His stated reason was that he had been relieved from the case almost six weeks prior to the receipt of Mrs. Grant's letter.

Respondent contended that the $5,000 was not returnable and was to be applied to his $25,000 fee. In support of his position, he offered an affidavit prepared by himself and signed by Carl, dated June 8, 1993. (Carl did not testify). The affidavit recites that Carl had retained respondent for a fee of $25,000 and that Tyrone Rush had paid the initial amount of $10,000. The second and sixth paragraphs stated: "I instructed my mother to pay an additional $5,000 to my attorney.... I informed [respondent] to keep the $5,000 and credit it to his retainer. I decided not to proceed with the bail." (The affidavit is silent as to when Carl allegedly so informed respondent.) According to respondent, the affidavit was signed by Carl on the second day of intensive plea bargaining between respondent and the prosecutor's office. Respondent explained his re-involvement in the case as follows:

A. I went to the jail to see Mr. Grant regarding the complaint made by his mother. He discussed it. He indicated that—

Q. MR. WILKINSON: You are talking about the grievance?

A. Yes. That it would be withdrawn. That it was a misunderstanding. That he felt abandoned when he was left having to be back to a public defender. But that it would all be straightened out.

I told him at that time, I said well, I will prepare then an affidavit for you based on what you've said to me and I will bring it back to you, and if it comports with what you are representing to me today, I will ask you to sign that.

\*     \*     \*     \*     \*     \*     \*     \*

Following that, we continued plea negotiations for Mr. Grant. Judge Codey allowed me to reinvolve myself as sort of co-counsel with [the attorney] who was representing Mr. Grant, and these negotiations took carried [sic] over a week....

In support of his position that he properly kept the $5,000, respondent pointed to the language of the receipt given to Mrs. Grant: funds "to be held for bail application ... returnable to M. Grant if bail not obtained." Respondent contended that the conditions set forth on the receipt had been fulfilled: he had prepared the bail application, had succeeded in having bail set and the only reason why bail had not been posted was that Paul's girlfriend had refused to sign the necessary documents to place their house as collateral for the bail. Having accomplished what he had been hired to do, respondent concluded, he was entitled to keep the monies.

Respondent drew a technical distinction between "obtaining bail" and "posting bail." Respondent offered expert testimony from Charles Truzzolino, a Newark bail bondsman, who explained the terminology to the DEC panel: "obtaining bail" is accomplished through an attorney's application to the court; "posting bail" is handled by a bail bondsman.

[Transcript and exhibit references omitted.]

According to the DEC, the agreement between Mrs. Grant and respondent was that the $5,000 payment would be refunded if Carl did not "get released from prison" and that respondent "seized on a technical interpretation of the term 'obtain' after the fact." The DRB agreed:

[T]he finding that respondent improperly and knowingly retained the $5,000 as fees is unavoidable. Like the DEC, the Board finds that, on the basis of the evidence presented—including the testimony of the witnesses—the logical conclusion is that the $5,000 was entrusted to respondent for the purpose of obtaining Carl's release from prison; otherwise, the $5,000 was to be returned to Mrs. Grant. The Board's finding is grounded on the same reasons expressed by the DEC in its report.

Specifically, respondent's argument that he fulfilled his part of the bargain by obtaining a favorable result to the bail application is specious. The record leaves no doubt that Mrs. Grant understood that the funds were to be returned to her if her son was not released. Mrs. Grant so testified—as did her daughter, Carol Barclay–Peart, who also attended the meeting between Mrs. Grant and respondent. Mrs. Grant's understanding was based on her agreement with respondent, which was briefly memorialized in the receipt prepared at that time: "Received of Marita Grant (2) Bank drafts totalling $5,000 on behalf of Carl Grant to be held for bail application; money is returnable to M. Grant if bail not obtained." The language on the receipt is clear: get Carl out of jail or refund the $5,000. Mrs. Grant had every expectation to recover the advanced funds in case her son was not released. If respondent's understanding of the agreement was different, he had an obligation to word the receipt carefully and clearly so as to eliminate any possible misunder-

standing on Mrs. Grant's part. Curiously, his claim that the monies were to "obtain bail" and that he did so surfaced only after Paul's girlfriend withdrew her consent to placing their house as security for the bail.

The circumstances surrounding Carl's signing of the affidavit persuade the Board that its preparation was belatedly contrived, six months after Mrs. Grant wrote to respondent seeking the return of the $5,000. As properly found by the DEC, Carl would have signed any document drafted by respondent if respondent successfully obtained the plea bargain Carl was seeking in his murder trial. Particularly telling is the omission in the affidavit of any reference that the $5,000 was Carl's money, specially taking into account that respondent himself prepared it. Also significant is the fact that respondent made no reply to Mrs. Grant's December 1992 letter or otherwise communicated with her or with her daughter concerning her request for the return of the $5,000. As with the DEC, the Board's suspicion is that respondent's claimed interpretation of the term "obtain bail" was the product of afterthought, following his realization that his $25,000 fee was jeopardized by the discovery that the previously received $10,000 was illegal money.

For the foregoing reasons, the Board is convinced that respondent knew from the beginning that the purpose of the $5,000 payment was to obtain Carl's release from prison and that, by refusing to return it to Mrs. Grant, he improperly retained monies that rightfully belonged to a third party, in violation of *RPC* 1.15(b).

Two members of the DRB would have dismissed the matter for lack of proof that respondent knew that he was to return the $5,000 to Mrs. Grant if Carl were not released from prison.

■ Respondent argues that the matter is simply a misunderstanding about the conditions under which Mrs. Grant paid him the $5,000. If so, he must bear the responsibility for that misunderstanding, particularly the part attributable to the ambiguity in the receipt.

Although we find some support in the record for respondent's version of the facts, we remain persuaded by clear and convincing evidence, as were the DEC and the DRB, that respondent improperly and knowingly retained the $5,000 payment as fees. Furthermore, respondent acknowledges his discourtesy in failing to communicate with Mrs. Grant when she sought the return of the $5,000. His counsel informed us at oral argument that respondent is willing to make restitution of the money. We accept that representation. Respondent shall notify the Clerk of the Court

within thirty days of the filing of this opinion that the repayment has been made.

Respondent has no history of ethics violations. His failure to clarify the conditions surrounding the payment of the $5,000 seems to be aberrational. Before entering private practice, he served as an assistant Essex County prosecutor. While in the prosecutor's office, respondent helped devise a Central Judicial Processing System for the courts. In light of the foregoing circumstances, we believe that we can maintain the public's confidence in the legal profession without imposing a suspension. On the facts of this case, a reprimand should suffice. *In re Pressler*, 132 *N.J.* 155, 623 *A.2d* 770 (1993); *In re Vaughn*, 123 *N.J.* 576, 589 *A.2d* 610 (1991); *In re Gioia*, 91 *N.J.* 378, 450 *A.2d* 1328 (1982).

Respondent is reprimanded for knowingly and improperly retaining Mrs. Grant's $5,000 payment.

We direct respondent to reimburse the Disciplinary Oversight Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

## ORDER

The Disciplinary Review Board having on August 16, 1995, filed its decision in this matter with the Court, and respondent having been ordered to show cause why he should not be disbarred or otherwise disciplined, and good cause appearing;

It is ORDERED that **RICHARD W. BANAS** of **BLOOM-FIELD,** who was admitted to the bar of this State in 1978, is hereby reprimanded for violating *RPC* 1.15(b); and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 10th day of May, 1996.

*For reprimand*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.